# Berkley *v.* Maurer, Appellant.

*Evidence—Handwriting—Experts—Comparison of hands—Opinion of witness—Act of May* 15, 1895, *P. L.* 69.

1. A witness having the qualifications prescribed by the Act of May 15, 1895, P. L. 69, to give opinion evidence based on his comparison of a disputed signature with duly proven standards, is not rendered incompetent by reason of his having acquired acquaintance with a person's handwriting by having seen him write.

2. The consideration to be given to this fact in weighing the witness's testimony depends upon the circumstances of the particular case, and, if he is found by the court to have the qualifications of a witness of the second class, it is for the jury. Amongst these circumstances may be mentioned the strength and vividness of the witness's recollection of the appearance and characteristics of the party's handwriting, his experience and skill, the thoroughness of his examination of the disputed signature separately as well as in juxtaposition with the duly proven standards, and his fair-mindedness, or the reverse, exhibited on the witness stand.

3. A cashier of a bank who has never seen a depositor write his name, is not a witness "acquainted" with the handwriting of the depositor merely because he paid four checks of the depositor, which checks were retained by the bank, and their genuineness never impliedly acknowledged by the depositor acquiescing in the action of the bank concerning them.

4. An attorney at law is not a witness "acquainted" with another's handwriting where he cannot say definitely that he had ever seen such person write his name, and where he cannot say definitely that letters he received from the party were replies to letters which he sent to him, or that they related to the business in which he was acting as attorney, or that their contents were such as to enable him to form an opinion as to their genuineness, or that the legal papers drawn by the witness were afterwards seen by him with what purported to be the client's signature upon them, or whether the papers were put into the hands of the client by the witness, or whether the client placed them in the hands of the witness after they were signed, or when and under what circumstances the witness saw them.

*Practice, C. P.—Trial—Mistake in charge.*

5. Where a trial judge makes a mistake in referring to a witness as in a class to which he does not belong, counsel should call the judge's attention of the slip at the conclusion of the charge, and if he fails to do so he cannot complain afterwards.

Argued May 6, 1909.  Appeal, No. 124, April T., 1909, by defendant, from judgment of C. P. Somerset Co., Feb. T., 1903, No. 214, on verdict for plaintiff in case of H. M. Berkley, Cashier, v. E. B. Maurer.  Before RICE, P. J., PORTER, HENDERSON, MORRISON, ORLADY, HEAD and BEAVER, JJ.  Affirmed.

Issue to determine the validity of a judgment entered upon a judgment note with the defendant's name upon it as surety.

At the trial the defendant denied that he signed the note.

James M. Cover, witness on the stand, was asked this question:

"Q. Mr. Cover, leaving out of your knowledge of Mr. Maurer's handwriting, your personal knowledge of his handwriting, and basing an opinion merely upon a comparison of these papers that have been submitted to you with the note in dispute, what do you say?"

Mr. Berkey: Objected to for the reason that the witness having said that he concluded the signature to the note was genuine because of his acquaintanceship with the handwriting of Mr. Maurer, he is incompetent and unable to differentiate between his ability as an acquaintance witness and that of an expert.

The Court: The objection is overruled.  The witness is permitted to answer the question precisely as it was put.  Exception noted to defendant. [1]

"A. Well, I think I would have to examine them a little further, then."

Mr. Ruppel; "Q. Please make the examination."

(Note and papers handed to witness for examination.)

"A. Well, there are some things about the signature, some peculiarities about the signature on the note, which differ from every other signature; yet, I should say from the signatures submitted, that the signature on the note was made by E. B. Maurer."

The Court: "Q. You mean made by the same hand that made the signatures to these other papers submitted?  A. Yes, sir."

H. M. Berkley, plaintiff, on the stand.

"Q. Mr. Berkley, have you examined the test papers submitted in this case with the signatures of E. B. Maurer?  A. I

have.  Q. Have you made a comparison between the name E. B. Maurer on the test papers and the name E. B. Maurer to the note in suit?  A. I made some comparison.  Q. In your opinion, who signed the name E. B. Maurer to the note in suit?"

Mr. Berkey: I now desire to cross-examine the witness as to his competency to answer the question asked.

The Court: We will permit it, as the plaintiff has not gone into any details as to the extent.

Mr. Berkey: "Q. You have already testified you have seen Mr. Maurer write his name?  A. I saw him write his name once. Q. Where?  A. In the First National Bank.  Q. Before or after you took this note?  A. Oh, that was before.  Q. It was the signature on the standard A?  A. Yes, sir."

Mr. Berkey: The offer just made by counsel for the plaintiff is objected to, as this witness has testified that he is acquainted with the signature of E. B. Maurer, and being acquainted with that signature by having seen him write, he is not competent to testify in the capacity of an expert.  The witness is not competent to testify in more than one capacity, either as a witness familiar with the handwriting in dispute or as an expert, but never in both capacities.

The Court: We are of the opinion that the mere fact that the witness is acquainted does not disqualify him from testifying as an expert, if he has established a special experience as provided by the act.  The objection here being not to the question of special experience, we overrule it and note an exception to the defendant. [2]

Mr. Ruppel: "Q. In your opinion, who signed the name E. B. Maurer to the note in suit?  A. E. B. Maurer, in my opinion, made that signature."

David Barry, witness on the stand:

"Q. What is your business?  A. Banking.  Q. How long have you been engaged in that business?  A. Twelve years. Q. In what capacity?  A. Cashier.  Q. Do you know E. B. Maurer?  A. Yes.  Q. How long have you known him?  A. My acquaintance with Mr. Maurer is limited to the short time that he kept an account in the Cambria National Bank.  Q. Have you seen any of his writing?  A. I have.  Q. What?  A. Some

of his checks drawn on our bank. Q. Have you seen him write his name? A. Not that I remember. Q. Have you had correspondence with him? A. I don't recall. Q. Have you those checks? A. Yes, sir. [Witness produces checks.] Q. Where have these checks been since they were made? A. In the Cambria National Bank and afterwards in the First National Bank. Q. Where you have been in charge? A. Yes, sir. Q. They have been in the bank you have been in charge of ever since they were paid? A. Yes, sir. Q. Did Mr. Maurer settle at your bank for these checks? A. He never lifted them; he opened an account and drew those checks against the account; he never called to have the checks surrendered to him. Q. Were there more checks in the bank than these? A. No more. That is, we have no more in our hands now. Q. But have there been more? A. I think not. I think his account was limited to the amount of these checks. Q. Have you examined the note in dispute? A. I have."

Mr. Berkey: I shall ask this question subject to stating to the court that I have already submitted these checks to Mr. Maurer, and we will follow this later with Mr. Maurer, who will identify these checks.

(Witness withdrawn for the present.)

E. B. Maurer, recalled. Direct examination by Mr. Berkey. (Witness shown exhibits 8, 9, 10 and 11.)

"Q. By whom were the checks signed, now in your hands? A. By myself."

David Barry resumes the stand. Direct examination by Mr. Berkey continued:

"Q. From your acquaintance with the handwriting of Mr. Maurer, as found upon the checks, will you state whether or not in your opinion the signature of Mr. Maurer upon the note in dispute is genuine or not?"

Mr. Ruppel: Objected to, for the reason that the witness has not qualified himself to answer this question.

The Court: This witness never having seen defendant Maurer sign his name, and having simply paid the checks and recognized the checks that are now identified by Maurer as bearing his signature, we think he is not qualified to answer the ques-

tion from the standpoint of one acquainted with the handwriting of the defendant; but, upon his testimony as to his twelve years' service as cashier of the bank, we think he may and we will permit him to testify to the character of the signature upon the note by comparison with the checks that he produced, or any of the other test papers that are in evidence. Exception noted to both plaintiff and defendant, and bill sealed. [3]

E. O. Kooser, A witness produced and affirmed upon behalf of defendant. Direct examination by Mr. Berkey:

"Q. What is your business? A. Attorney in Somerset. Q. For how many years have you been in that business? A. Since 1892, I think. Q. How long have you known E. B. Maurer, assuming that you know him? A. Probably fifteen years; ten or fifteen years, probably. Q. Have you had any business relations with him? A. I was attorney for him when he was assignee of Robert Pickworth. I don't know that I had any other; I may have. Q. Are you familiar with his signature? A. Well, I haven't seen his signature for a long time. Q. Have you seen him write his name? A. I think I have. Q. Have you examined the signature upon the note in dispute? A. Let me see the note in dispute, please. [Note in dispute shown witness.] A. This is the note in dispute. Q. Have you examined it? A. Yes, sir. Q. State whether or not in your opinion the name E. B. Maurer upon the note is his genuine signature?"

Mr. Ruppel: Objected to, for the reason that the witness is not qualified to answer.

Mr. Berkey: "Q. Have you seen him write his name? A. He was about the office there a good deal. I think I have. I have no picture of seeing him with a pen in his hand, that I can recall. I surely think I have seen him write his name about the office. Q. Did you have correspondence with him? A. Yes, sir. Q. Has he written letters to you? A. Yes, sir. I drew some papers for him to which his signature is attached. Q. Some of the standards that were offered by the plaintiff? A. Well, they were petitions in the Pickworth estate. I think they were offered as standards, but I really don't know about that. The body of this paper here, a return of sale in the Robert Pick-

worth estate, is in my handwriting. Q. Whose signature is it? A. It is here E. B. Maurer. Q. Was that signed in your presence? A. I can't say that it was. I see it is sworn to here before David L. Wynn. Q. You have had letters from him? A. Yes, sir. Q. Do you know his handwriting when you see it? A. Well, I would without swearing point-blank as to whether a man knows his handwriting, which is a little difficult, form my own opinion whether it is or not. I would have an opinion on the subject. I have a decided opinion. Q. Have you in your mind an exemplar of his signature? A. Yes, sir, I have."

Objected to. Objection sustained, and exception noted. [4]

Defendant presented this point:

3. Evidence of a handwriting expert alone is not sufficient to establish forgery. *Answer*: As applicable to this case, I decline this point. As I have heretofore said, I submit for your consideration all the evidence admitted on the trial. [5]

The court charged the jury in part as follows:

[One person only testified to positive knowledge of it, and that is Mr. Maurer. He alone of all the witnesses, pretends to know, to have actual knowledge, of whether this signature was made by him or not.] [6]

[The plaintiff, before offering that note in evidence, called upon the stand first Mr. Cover, who testified to you from the two standpoints; first, that he has had an acquaintance with Mr. Maurer running over a period of years, Cover having been a merchant and justice of the peace, I believe, in the neighborhood where Maurer lived. After testifying from his familiarity with Maurer's handwriting, he stated in his opinion, the signature E. B. Maurer upon the note was the genuine signature of E. B. Maurer. Later he was asked as to his own business pursuits, and testifying that he had been, besides being a merchant, as I have stated to you, register of wills and recorder of deeds of the county; that he had been a cashier for a while in the First National Bank of Rockwood, and more lately, was a Pennsylvania state bank examiner, and that he was familiar with handwritings and has had special experience with handwritings. Under that form of testimony, he was permitted to answer in

the second class as one who was competent to be called an expert in handwriting, and in that light he testified that from comparison with a number of other signatures which had been offered in evidence and had been shown to be genuine signatures of Mr. Maurer, made at different times, covering a long period of years, and under different circumstances, and upon different papers of different forms, that it was his opinion that this is the genuine signature of Mr. Maurer.] [7]

[Following Mr. Cover then were put upon the stand a number of gentlemen, all, I believe, who had been connected in one capacity or another, mainly, perhaps, as cashiers in banks or as secretaries of trust companies: Mr. John D. Roberts, of Johnstown; Mr. D. Roberts, of Johnstown; Mr. Philson, of Meyersdale; Albert Reitz, of Elk Lick; Mr. D. L. Miller, of Confluence, and Mr. E. K. Gallagher, of Somerset; and Mr. Berkley, the plaintiff, was also upon the stand. . . .

They were placed upon the stand, and testified in this second class of persons who have had special experience with documents, handwritings and alterations, and to them were submitted these papers which are called standards, first having proven or having it admitted that they bore the genuine signature in each of them, of Mr. Maurer. In various forms of expression, they each testified that they had examined the standards and examined the note, and from such expressions, "I conclude that this signature upon the note was made by the same hand that made the signatures in the standards," and such expressions as, "I believe the signature was made by Maurer," and "I think E. B. Maurer wrote the name," etc.; but whatever the form of answer made by the witness was, it all came to this, that after an examination of those standards upon what they stated was their special experience, they arrived at the opinion that the name on this note, E. B. Maurer, was written by E. B. Maurer, the defendant.] [8]

Verdict and judgment for plaintiff for $1,158.13. Defendant appealed.

*Errors assigned* were (1–4) rulings on evidence, quoting the bill of exceptions.

*J. A. Berkey,* with him *C. L. Shaver,* for appellant.—It is clear as a psychological proposition that the witness was incapable and incompetent as an expert, having in his mind an exemplar of Maurer's signature acquired by acquaintance with it: Travis v. Brown, 43 Pa. 9; Gentner v. Ulmer, 15 Phila. 233.

Enough was developed in the examination of the witness Kooser to render him competent though defendant's counsel interjected an objection in the midst of the examination which was promptly sustained by the trial court: Shitler v. Bremer, 23 Pa. 413.

*W. H. Ruppel,* with him *G. R. Scull* and *J. R. Scott,* for appellee, cited: Bank v. Jacobs, 1 P. & W. 161; Baker v. Haines, 6 Whart. 284.

OPINION BY RICE, P. J., October 11, 1909:

The question being as to the genuineness of the signature of E. B. Maurer, opinion evidence of two classes of persons was admissible and relevant: (a) any person "acquainted" with his handwriting; (b) persons who, to use the words of our statute, "have had special experience with or who have pursued special studies relating to documents, handwriting and alterations thereof who are herein called experts:" Act of May 15, 1895, P. L. 69. Prior to this statute there had been much diversity of opinion, and of decision as well, upon the question of "comparison of hands." But it was finally settled in Travis v. Brown, 43 Pa. 9, decided in 1862, and the rule was adhered to in later cases down to and including Rockey's Estate, 155 Pa. 453, decided in 1893, that it was not competent to call in chief a witness of either of these classes to make comparison between the paper in suit and other well authenticated writings of the same party admitted as test papers, and to testify to his conclusions from such comparison; the comparison was to be made by the jury. So far as the competency of a nonexpert witness is concerned, the law remains the same: Groff v. Groff, 209 Pa. 603. And there is good reason why it should be so. Where specimens are brought into court there is no need of any opinion based on them except from persons skilled in handwriting; for the jury

can judge as well as any other layman: 3 Wigmore on Evidence, sec. 1997. The second section of the act makes it competent for experts, evidently meaning the persons called experts in the preceding section, in giving their testimony to make comparison of the disputed handwriting with any documents or writing admitted to be genuine, or proven to the satisfaction of the judge to be genuine, and declares that their testimony respecting the same shall be submitted to the jury as evidence of the genuineness or otherwise of the writing in dispute.

The question raised by the first, second and seventh assignments of error relates to the competency of a witness to make a comparison of hands, where he is both acquainted with the handwriting of the party whose signature is in dispute, and also possesses the qualifications of the persons whom the statute designates as experts. The question is brought out very sharply in the first assignment of error, where it appears that such a witness was asked to leave out of view his personal knowledge of Maurer's handwriting, acquired by having seen him write on other occasions, and testify to his opinion based merely upon a comparison of the disputed signature with other well authenticated signatures of Maurer upon writings admitted as test papers. The objection to the testimony is not put by appellant's counsel on the ground that this witness had any incapacity to do this which is not common to all handwriting experts, but on the assumed psychological proposition that no person, no matter how skilled in chirography, who has in his mind an exemplar of another person's handwriting, acquired by having seen him write, is capable of forming an independent and a wholly unbiased opinion as to the genuineness of the disputed signature of that person, based exclusively upon his comparison of it with duly proven standards. These are not the exact words of counsel, but we believe they present fairly the idea which one branch of their argument leads to. In support of their contention, counsel cite the following language of WOODWARD, J., in Travis v. Brown: " Nor is he an expert who is called to compare a test writing, whose genuineness is established by others, with the writing under investigation, if he have knowledge of the handwriting of the party, because his

judgment of the comparison will be influenced more or less by his knowledge, and will not be what the testimony of an expert should be, a pure conclusion of skill." But inasmuch as one of the points decided in that case was that mere experts were not admissible to make the comparison and to testify to their conclusions from it, the foregoing observations, although entitled to the highest respect, could scarcely be regarded as a binding decision of the question now under consideration, even if there were no statute on the subject. The same is true of the dictum in Gentner v. Ulmer, 15 Phila. 233, "that a witness is not competent to testify in more than one capacity. He cannot give his opinion from a knowledge of the handwriting and as an expert, nor can he be examined as an expert if he has such knowledge." We are warranted in speaking of this as a dictum, for the report of the case on writ of error, 3 Penny. 453, fails to show that this precise question was raised in the case; it certainly was not raised by the assignments of error and was not alluded to in the opinion of the Supreme Court. Nor are we convinced that the rule as broadly stated by the trial judge in Gentner v. Ulmer had been established by precedent as part of the common law of Pennsylvania, or that such a rule would be deducible from established principles of law or of science. But we need not further discuss the cases prior to the act of 1895. As was said by Justice Woodward in Travis v. Brown, when evidence by comparison of hands should be received, whether the witness making the comparison should be qualified by personal knowledge of the party's handwriting, when mere experts should be admitted to make comparisons, and what degree of evidence is required to establish the genuineness of the test papers, were questions that had been debated in a multitude of cases. And it is a matter well known to the profession, that even after the clear enunciation of the five rules in that case, the subject of comparison of hands was agitated and many cogent reasons were urged in favor of a more liberal rule. This led to the passage of the act of 1895, which is not a mere codification of existing rules established by the decisions, but was intended to establish a new and different rule. The legislature did not content itself with merely declaring that experts might make

comparison of hands, but prescribed generally the qualifications which the witness must possess. If the legislature had deemed it wise that the witness must have, in addition, the negative qualification of having acquired no acquaintance with the person's handwriting by seeing him write, we are convinced that it would have said so in unmistakable terms. This omission must be deemed to have been intentional, because the state of the law as declared in Travis v. Brown and subsequent cases in the same line must be presumed to have been known to the legislature, and to have been considered by it as requiring a radical change. The legislature evidently went on the well-warranted supposition that a witness having the prescribed qualifications can aid the jury to some extent at least, even though he may not have the additional negative qualification. The statute is remedial in its nature, and its purpose ought not to be defeated or hindered by excessive refinement of construction which goes to the extent of introducing a qualification which the legislature saw fit to omit. We conclude that a witness having the qualifications prescribed by the statute to give opinion evidence based on his comparison of the disputed signature with duly proven standards is not rendered incompetent by reason of his having acquired acquaintance with the person's handwriting by having seen him write. The consideration to be given to this fact in weighing the witness's testimony depends upon the circumstances of the particular case, and, if he is found by the court to have the qualifications of a witness of the second class, is for the jury. Amongst these circumstances may be mentioned the strength and vividness of the witness's recollection of the appearance and characteristics of the party's handwriting, his experience and skill, the thoroughness of his examination of the disputed signature separately as well as in juxtaposition with the duly proven standards, and his fair-mindedness, or the reverse, exhibited on the witness stand. The first, second and seventh assignments are overruled.

The third assignment of error complains of the rejection of the offer of David Barry as a witness "acquainted" with the handwriting of Maurer. He had never seen Maurer write, nor had he had any correspondence with him that he could recall.

But he was cashier of a bank in which Maurer made a deposit, and four checks purporting to be signed by Maurer were presented to the bank and paid. The checks were not called for by Maurer but were retained by the bank, and it does not appear that a settlement of the account took place between them, or that Maurer impliedly acknowledged the genuineness of the checks by acquiescence in the action of the bank concerning them. The dissimilarity of the qualifications of this witness and those of D. W. Weller, whose competency was passed on when this case was here before, is clear and very material. There there was sufficient evidence to qualify the witness under the rule applicable to acquaintance with the handwriting of a party, acquired in the course of business with him, from signatures impliedly acknowledged to be genuine, and acted on by both parties as such. In the present case there is no evidence of Maurer's acknowledgment of the genuineness of the signature to the four checks, prior to the time when they were shown to him on the trial. The knowledge which the witness then acquired of their genuineness did not qualify him to testify as one acquainted with the handwriting of the party: Reese v. Reese, 90 Pa. 89. In holding that his special experience for twelve years in a bank qualified him to testify from a comparison of hands, and that alone, the court went as far as the defendant had a right to ask. The third assignment is overruled.

The rejection of the opinion evidence of E. O. Kooser, based on his acquaintance with Maurer's handwriting, is the subject of complaint in the fourth assignment. The witness is a member of the bar. He testified that he had been attorney for Maurer when he was assignee for Robert Pickworth, that he thought he had seen him write his name when he was about his office, but, to use his words, "I have no picture of seeing him with a pen in his hand that I can recall;" that he had correspondence with him and had received letters from him; that as his attorney he had drawn papers for him to which his signature was attached, amongst which were petitions in the Pickworth estate and a return of sale in the same estate, but that he could not say they were signed in his presence. Before a man is permitted to state his belief of the genuineness or the contrary of

the handwriting of another, he must state facts and circumstances to show he has knowledge enough to speak of it with reasonable certainty: Slaymaker v. Wilson, 1 P. & W. 216; Porter v. Wilson, 13 Pa. 641. One mode of acquiring such knowledge is by having seen him write, and it is said to be sufficient to make the witness competent if he has seen the party write but once and then only his name. The probative value of the opinion of such a witness may be very slight, but the jury will be permitted to weigh it: 1 Greenleaf, Evidence, sec. 577 (15th ed.); Wilson v. VanLeer, 127 Pa. 371; Broadrick v. Broadrick, 25 Pa. Superior Ct. 225. But where the fact that the witness has seen the party write is left in uncertainty by his own preliminary examination, the trial judge cannot be convicted of error in rejecting his opinion as to the genuineness of the disputed signature unless he has acquired knowledge of the party's handwriting in some other legally recognized mode. Another mode of acquiring such knowledge is thus described in Porter v. Wilson, 13 Pa. 641, following Best on Principles of Evidence, sec. 215 et seq., and 1 Greenleaf, Evidence, sec. 577: "The second mode, is from having seen letters or other documents purporting to be the handwriting of the party, and having afterwards personally communicated with him respecting them, or acted upon them by written answers producing further correspondence or acquiescence by the party in some matter to which they relate, or by any other mode of communication between the party and the witness, which, in the ordinary course of the transactions of life, evidences a reasonable presumption that the letters or documents were the handwriting of the party." In Commonwealth v. Smith, 6 S. & R. 568, the question was as to the genuineness of the signature of a cashier of a New York bank. The cashier of a bank in another city was permitted to testify to his opinion upon the question after having shown that as cashier he had correspondence for many years with the New York bank, that his letters had been addressed to the cashier and answered by him, and that receipt of bills remitted had been acknowledged by him. In United States v. Simpson, 3 P. & W. 437, the witness was held to be competent upon proof that he had often remitted money to the party and received his

receipts in return. In Clark v. Freeman, 25 Pa. 133, the witness was permitted to express his opinion from knowledge of the handwriting of the party acquired from correspondence with him in which the witness had addressed him letters and received replies thereto. In each of these cases, which may be taken as fair illustrations of the general rule relating to acquaintance from correspondence, the exemplar in the mind of the witness with which he compared the disputed writing was formed from his observation of other writings which he had reasonable ground for believing to be genuine. This principle, however, does not extend to a witness who has had no correspondence with the party, and has no knowledge of his handwriting except that which he derived from letters written to other persons which purported to have been written by him, even though he swears that the contents of the letters were of such a character as to enable him to judge certainly of their genuineness: Phila., etc., R. R. Co. v. Hickman, 28 Pa. 318. The witness in the present case did not say that the letters he received were replies to letters he sent to Maurer, or that they related to the business in which he was acting as attorney for Maurer, or that their contents were such as to enable him to form an opinion as to their genuineness; nor was the court bound to infer either of these facts from what the witness did testify to. To clearly qualify a witness to testify to his opinion concerning the genuineness of a disputed signature, based on his comparison of it with the exemplar in his mind formed from correspondence alone, the trial judge is justified in requiring something more to be shown than merely that the witness has received a letter or letters purporting to bear the signature of the party, or that the witness has written and mailed letters to him, or both. We come then to a consideration of the acquaintance of the witness with the handwriting of Maurer derived from his observation of the other papers referred to in the testimony. These papers were drawn by the witness as Maurer's attorney and were afterwards seen by the witness with what purported to be Maurer's signature upon them. Whether these papers were put into the hands of Maurer by the witness, whether Maurer placed them in the hands of the witness after they were

signed, when and under what circumstances the witness saw them before the trial, are questions upon which the testimony of the witness is silent. These matters, although susceptible of clear proof, were left to inference, and the question is whether the judge is to be convicted of error because he did not draw the inferences necessary to qualify the witness to testify to his opinion derived from having seen the papers after they were signed. As in the question of acquaintance with the hand-writing of another, derived from the receipt of letters purporting to be signed by him, so in the question of such acquaintance derived from seeing other documents purporting to bear his signature, the essential requisite is that the disputed writing shall be tested by its resemblance to the exemplar in the witness's mind of documents in the genuineness of which the alleged writer has acquiesced. His acquiescence in the genuineness of the documents, from which the witness acquired his acquaintance ante litem motam, may be shown by his express acknowledgment of them in the presence of the witness, as in Second National Bank of Reading v. Wentzel, 151 Pa. 142, or by his acting on them to the witness's knowledge as genuine, or knowingly permitting the witness to act on them as genuine, and perhaps by other modes, but it must be shown. Taking a strict view of the testimony of the witness in the present case, we cannot say that there is manifest error in the court's conclusion that this essential requisite was not as satisfactorily established as it ought to have been, and as it easily could have been, if it existed. It is proper to take this view of the testimony before reversing the judgment of the trial court upon a question addressed so largely to its discretion: Wilson v. Van-Leer, 127 Pa. 371; Irwin v. Patchen, 164 Pa. 51; Hemphill v. McClimans, 24 Pa. 367. The fourth assignment is overruled.

In support of the fifth assignment counsel for the defendant argue that he was entitled to instructions that if for any reason the jury found the testimony of the other witnesses unsatisfactory to them and threw it out altogether, the purely expert testimony would not be sufficient to sustain a verdict in the plaintiff's favor. It is true expert testimony is usually regarded as corroborative only, but it is unnecessary to go into an elabo-

rate discussion of that subject because the defendant's point, the refusal of which is the subject of this assignment of error, was not so framed as to call for a ruling upon the question suggested in the argument of counsel. If the plaintiff's case had depended upon the establishment of the fact that the disputed signature was a forgery, there might have been some appropriateness in the point, but it did not. It was the defendant who alleged the forgery, and he introduced expert testimony to sustain his allegation, and therefore it seems obvious that the refusal of the point did not prejudice his case. It is to be observed further that in answer to the other points of the defendant, which were affirmed, the jury were as fully instructed upon the question of the reliability of this class of testimony as the case required.

We cannot agree that the learned judge's allusion to the defendant in the part of the charge complained of in the sixth assignment of error was prejudicial to him. It was a statement which was rather calculated to impress upon the minds of the jurors the fact that the defendant's actual knowledge was superior to that of the other witnesses. This assignment is overruled.

In the enumeration and classification of the many witnesses who had testified on the one side and the other, the learned judge inadvertently spoke of E. K. Gallagher as being one of the witnesses who had testified as experts. He had not testified as an expert, but as one acquainted with the handwriting of Maurer. It is not at all plain that the plaintiff did not have more right to complain of the inadvertence than the defendant. But be that as it may, the duty of either party who felt aggrieved was to call the judge's attention to the slip at the conclusion of the charge. There are numerous late cases in which it has been held that the omission to do so estops the party from complaining afterwards. A notable case is Providence Life & Trust Co. v. Philadelphia, 202 Pa. 78. In conclusion, we remark that the case was submitted to the jury in a clear, adequate and impartial charge and that no error appears of record which would justify a reversal of the judgment.

The judgment is affirmed.